UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x
NANCY WOODLOCK
                          Plaintiff,

              - against -

ORANGE ULSTER B.O.C.E.S, DR.
ROBERT HANNA, in his official and
individual capacities as an aider and abettor;
JAKE MCHALE, in his official and
individual capacities as an aider and abettor;
NANCY TAMBINI, in her official and
individual capacities as an aider and abettor.

                         Defendants.
--------------------------------------------------------x

04 Cv. 5800 (CLB)

*Memorandum and Order*

Brieant, J.

      This is a First Amendment relation case, brought pursuant to 42 U.S.C § 1983, with due process violations claimed as well. Before this Court is Defendants' motion for summary judgment (Doc. No. 21) filed on January 30, 2006. Opposition papers were filed on April 6, 2006, and reply papers were filed on May 15, 2006. The motion was fully submitted to the Court as of May 15, 2006.

      The following facts are assumed to be true for the purposes of this motion only.

      On July 26, 2001, Defendant Orange-Ulster BOCES ("BOCES") appointed Plaintiff Mrs. Nancy Woodlock to the position of school counselor, effective September 4, 2001, at an annual salary of $42,661.00. When hired, Mrs. Woodlock, also a registered nurse, held two master's degrees in community mental heath and health services administration. She also possessed

1

sixty-two graduate degree credits which satisfied the requirements necessary to become a certified school counselor. Since 1977, Mrs. Woodlock has provided care to mentally-disabled individuals, ages sixteen through adulthood.

During the 2001-2002 academic year, Plaintiff was assigned to the BOCES High School Crisis Room[1], and Defendant Principal Jake McHale was her supervisor. McHale advised Mrs. Woodlock that she could confer with Mrs. Susan Murray-Tetz, the mental heath coordinator for BOCES school counselors, regarding student counseling issues. In this way, Mrs. Murray-Tetz acted as a liason between school counselors and the psychiatric team for BOCES, assisting counselors in obtaining additional resources for students and arranging staff development training.

In October 2001, based on her drug and alcohol credentials, BOCES administrators asked Mrs. Woodlock to assume the additional role of a Substance Abuse Counselor for a new BOCES drug and alcohol program called RESTART, which served students coming out of drug or alcohol rehabilitation programs. In the RESTART program, Mrs. Woodlock provided individual and group counseling to recently rehabilitated students. As a result of this assignment, Mrs. Woodlock split her workload between RESTART and the Crisis Room, reporting to two principals, McHale and Ms. Debbie Brunjes. During this academic year, Mrs. Woodlock received favorable evaluations and observations from both principals. Plaintiff also received a

---

[1]Crisis Room staff respond each time students are in crisis, which, according to Principal McHale, occurs between ten and fifteen times a day.

letter of appreciation from Principal Brunjes, acknowledging her "flexibility and dedication toward improving student outcomes" and her ability to "voice concerns and goals professionally and patien[tly] while waiting for advice and direction." Pl. Ex. F, Memorandum from Deborah Brunjes, dated Mar. 6, 2002.

During the 2002-2003 academic year, Plaintiff transferred within the district to another school counselor position at the Goshen Satellite Program for autistic students, under Principal Barbara Butler. There, in addition to the responsibilities Mrs. Woodlock had at BOCES, Mrs. Woodlock also reviewed the current goals contained in the counseling sections of each student's Individualized Education Plans ("IEPs") and projected program revisions for the upcoming year.

In the 2003-2004 academic year, Mrs. Woodlock was selected as the school counselor for the newly-opened BOCES Cornwall Satellite. Prior to taking that position, Plaintiff was advised that she would be working with the highest-functioning students, those who could benefit from the mainstreaming opportunities offered in a regular education setting. Superintendent Marguerite Flood advised Mrs. Woodlock that she was excited to have her at the Cornwall Satellite because Mrs. Woodlock had conducted her school counselor internship at Cornwall in 2000, and therefore had pre-established relationships with the Cornwall staff. Mrs. Flood also stated that since Mrs. Woodlock had prior experience working with Jake McHale, who would again be Mrs. Woodlock's supervisor at the satellite, the arrangement presented a "win-win" proposition. Pl. Ex. C, pp.86-87, and 89.

The BOCES Cornwall Satellite staff consisted of one school counselor, three teachers, three teacher's aides, a full time secretary, and off-site administrators. The off-site administrators at Cornwall were Principal McHale, and an administration student intern, Defendant Nancy Tambini-Wall. Mrs. Tambini-Wall did not have any supervisory experience prior to being placed in charge of the Cornwall Satellite. Because Mrs. Tambini-Wall was a student intern, and not an assistant principal, she was not to conduct staff performance observations or render independent policy decisions, though Plaintiff contends that she ran Cornwall with minimal or no supervision. She acted as the BOCES representative at the Cornwall site, met with staff, and made decisions concerning Cornwall. Mrs. Tambini-Wall advised Plaintiff that the Cornwall Satellite staff was to communicate any and all concerns to her, which she would then communicate to McHale; Plaintiff believed that because Cornwall did not have on-site administrative supervision, staff members were expected to call BOCES Campus in Goshen and attempt to locate an administrator to address concerns.

*Mrs. Woodlock Raises Concerns:*

In the fall of 2003, Plaintiff advised Mrs. Tambini-Wall that the failure to have a certified gym instructor assigned to the Cornwall Satellite was a violation of state education mandates. Mrs. Tambini-Wall, a former guidance counselor, disagreed, and stated that in any event she and Jake McHale were working on hiring a certified gym instructor. In January 2004, Mrs. Woodlock had another conversation with Defendant Tambini-Wall and raised concerns about the lack of a certified gym and a certified art instructor. Plaintiff specifically advised Mrs. Tambini-Wall that the Satellite's continued failure to provide certified art instruction violated state

4

education mandates and students' IEP's; in response, Mrs. Tambini-Wall stated that BOCES had not contracted with Cornwall for the use of their gym facilities. Thus, the satellite-assigned students could not use the gym or swimming pool–there was apparently no response as to the art instructor query. Plaintiff contends that Superintendent Flood (not a party to this action) knew there was no gym or art instruction for the entire 2003-2004 academic year at Cornwall, and that Principal McHale knew, at the very least, that Cornwall students did not receive gym instruction during the 2003-2004 academic year. To Plaintiff's understanding, gym and art instruction were mandated instruction based on the student's IEPs and course requirements for all ninth grade students. Plaintiff made telephone calls to McHale regarding these issues; he did not return her calls.

From October 2003 to February 2004, Plaintiff called McHale and Mrs. Tambini-Wall to raise concerns about safety issues caused by a violent, traumatic brain injured student, "M.C." During this period, there were at least seven written communications regarding the student's escalating behavior. Plaintiff contends that student M.C.'s Monthly Medicaid Report shows that during a two week period in November 2003, the student was in crisis six times, disrupted instruction three times and engaged in impulsive behavior twice. Other concerns raised by Mrs. Woodlock include:

- On October 30, 2003, Plaintiff advised Defendant Tambini-Wall that student M.C. had smeared feces in the bathroom. Mrs. Tambini-Wall advised Mr. McHale but nothing was done because no one had seen the student commit the act.

- Also on October 30, 2003, Plaintiff advised Defendant Tambini-Wall that some students had inappropriately used the internet. Defendant McHale did not recall speaking to Mrs. Tambini-Wall concerning this issue.

5

- On November 13, 2003, Plaintiff faxed a notice to Mrs. Tambini-Wall stating that "boys attempt[ed] to light M.C.'s hair on fire on bus."

- Mrs. Woodlock followed up with calls on November 14, 17, and twice on November 19, with no returned call or response from Mrs. Tambini-Wall or Principal McHale, despite Plaintiff's representation that M.C's parents were concerned about the safe transportation of their son.

- During a conversation with Mrs. Tambini-Wall in November 2003, Plaintiff questioned the appropriateness of the satellite placement for M.C. as had Adrienne Greene, M.C.'s teacher. Plaintiff raised school safety concerns related to the student's escalating aggressive behavior toward staff and students. During this conversation, Plaintiff requested that Mrs. Tambini-Wall schedule a functional behavioral analysis (FBA) with the staff psychiatrist for Student M.C.; Mrs. Tambini-Wall agreed, though the FBA was not set up until January 2004, in response to an emergency situation involving Student M.C.

- Plaintiff expressed concerns about BOCES liability as Student M.C.'s violent behaviors escalated, and over the loss of good will in the surrounding school districts that would occur if others knew the administration failed to remedy the situation.

Based on the number of calls Mrs. Woodlock made to the administrative offices without response, she began keeping a log of her attempts to contact her supervisors. Plaintiff also contends that she faxed numerous memos and behavior reports to the administration seeking guidance with respect to Student M.C.'s violent conduct. Plaintiff contends that after speaking out about the lack of administrative action at the satellite regarding Student M.C.'s violent behaviors, Plaintiff was given her first written warning from Defendant McHale.

On January 7, 2004, M.C.'s behavior escalated to an "unbearable level" as written in a letter from Ms. Adrienne Greene to M.C.'s parents. She noted that the student was volatile,

6

hostile, and verbally abusive to staff and students. That day, Ms. Greene followed up on the November 2003 request to Mrs. Tambini-Wall that she schedule an FBA for M.C. On January 8, 2004, M.C. threatened to kill herself and cause harm to others. Based upon her behavior, Cornwall High School security was called to remove her from the classroom. On January 9, 2004, when Mrs. Woodlock called the administration building regarding M.C.'s heightened aggression, she was once again relegated to leave messages for McHale and Mrs. Tambini-Wall. Plaintiff then called the next person in the chain of resources, Susan Murray-Tetz, who accepted Mrs. Woodlock's call and immediately put Dr. Hahn, one of the psychiatrists, on the phone with Mrs. Woodlock to discuss intervention techniques for de-escalating M.C.'s behaviors. Dr. Hahn offered to conduct an FBA for M.C. to assist staff in dealing with her and her issues. During her conversation with Mrs. Murray-Tetz, Mrs. Woodlock advised her of the lack of administrative presence at the satellite. She advised Mrs. Murray-Tetz that Jake McHale and Nancy Tambini-Wall's failure to provide guidance to the Cornwall Satellite had undermined staff's ability to provide instruction and services. On January 14, 2004, Plaintiff was "written up" for the January 9, 2004 telephone call to Mrs. Murray-Tetz, and the subsequent steps that resulted in an FBA being scheduled for Student M.C. The memorandum reads:

> In the past week you took it upon yourself to go out of process in contacting Susan Murray-Tetz, as well as the Washingtonville CSE [Committee on Special Education], concerning M.C. Nancy Tambini-Wall had already spoken with me and had arranged a meeting with Dr. Blanco. This memo is to notify you that you are to contact Nancy Tambini-Wall or myself on all matters related to Cornwall students. You do not have the authority to contact CSE's to arrange services for students without prior approval. Exh. G, Documents Relating to M.C. (Matter in brackets added.)

As a result of that write up, Plaintiff wrote a rebuttal in which she documented that she

7

had attempted to notify Defendants McHale and Mrs. Tambini-Wall by calling them first and leaving messages at their respective offices. Plaintiff copied each of the individuals to whom Defendant McHale had sent copies of his disciplinary memo–Superintendent Flood, Jeff Smith, and Kathy Carmody. Mrs. Woodlock never received a response to her rebuttal. Mrs. Woodlock also contends that she was not aware, at that time, that Defendant McHale had an unwritten policy wherein counselors were not permitted to speak with the psychiatrists, or schedule FBAs. In fact, Mrs. Murray-Tetz advised her of the opposite, stating that BOCES counselors can call her directly for the psychiatrist should help be needed.

In early February 2004, Mrs. Murray-Tetz visited the Cornwall Satellite and asked Mrs. Woodlock whether Jake McHale and Nancy Tambini-Wall's attendance at the satellite had improved--Plaintiff contends they were not frequently present--since their conversation on January 9, 2004. Mrs. Woodlock represented that it had not. Thereafter, Mrs. Woodlock was again disciplined.

Mrs. Woodlock also contends that (1) she was unfairly written up for leaving early on February 12, 2004 (she contends that all left early that day because the computer system had crashed) and that (2) a disciplinary memorandum was unfairly placed in Mrs. Woodlock's file on February 24, 2004, alleging that she put her hands on a student, causing his behavior to escalate, that other staff had to intervene, and that she acted unprofessionally (while eyewitness accounts are contrary). On March 5, 2004, Defendant McHale advised union representative John Zwick

that he would not recommend Mrs. Woodlock receive tenure[2] to the BOCES board, and that she could resign in lieu of being terminated. He advised Zwick that if she resigned, she could use the favorable evaluations she received from Barbara Butler and Debbie Brunjes. On March 8, 2004, Plaintiff resigned in lieu of being denied tenure.

Mrs. Woodlock now contends that she was denied tenure and was constructively terminated in retaliation for her speaking out about matters of public concern, and that any other reason offered by Defendants is pretextual. Plaintiff seeks a jury trial, compensory and punitive damages, and reasonable attorneys' fees. Plaintiff concedes that her due process claim fails, and it is therefore dismissed. Defendants seek summary judgment on the remaining § 1983 claim.

*Summary Judgment Standard*

Fed. R. Civ. P. 56(c) provides that summary judgment shall be rendered if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." If "reasonable minds could differ as to the import of the evidence," summary judgment is inappropriate. *Anderson v. Liberty Lobby*, 477 U.S. 242, 250 106 S. Ct. 1505, 2513 (1986). In evaluating the record to determine whether there is a genuine issue as to any material fact, "the evidence of the non-movant is to be believed and all

---

[2] The tenure process is a three year process whereby a person is evaluated three times each year by an administrative supervisor. Mrs. Woodlock had received favorable reports for both the first and second years; she did not receive favorable reports from Supt. Flood and McHale for the third year, 2003-2004, even though she had received satisfactory evaluations from three different principals during that time.

9

justifiable inferences are to be drawn in his favor." *Anderson* at 255 (1986). If, as to the issue "on which summary judgment is sought, there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Chambers v. TRM Copy Centers Corp.*, 43 F.3d 29, 37 (2d. Cir. 1994).

*Section 1983 Claims:*

For a public employee, such as Mrs. Woodlock, to succeed on a First Amendment retaliation claim under Section 1983, she must show her speech was constitutionally protected, that she suffered an adverse employment action, and that there is a causal relationship between her utterance of the speech and the subsequent adverse employment action. *See, e.g., Washington v. County of Rockland*, 373 F.3d 310, 320 (2d Cir. 2004) (*citing Morris v. Lindau,* 196 F.3d 102, 110 (2d Cir. 1999). Defendants contend they are entitled to summary judgment, because Mrs. Woodlock's speech is not constitutionally protected (it related exclusively to her duties and responsibilities as a school counselor); that she did not suffer an adverse employment action (because Plaintiff was not denied tenure but rather resigned before the tenure process began); and that there was no causation between her alleged constructive termination and her speech (because Principal McHale was not aware of her speech and was already aware of the issues that Plaintiff contends to have raised). The Court is not convinced by Defendants' assertions.

*Was Mrs. Woodlock's Speech Constitutionally Protected?:*

A public employee's right to freedom of speech is not absolute. *See e.g., Waters v. Churchill*, 511 U.S. 804 (1994); *Jeffries v. Harleston*, 52 F.3d 9 (2d Cir. 1995), cert. denied, 516

10

U.S. 862 (1995). When a dispute arises relating to the First Amendment rights of a public employee, the courts must balance the employee's right to comment on matters of public concern with the government's interest as an employer to provide public services effectively and efficiently. *Connick v. Myers*, 461 U.S. 138, 142, 75 L. Ed. 2d 708, 103 S. Ct. 1684 (1983); *Pickering v. Board of Educ.*, 391 U.S. 563, 568, 20 L. Ed. 2d 811, 88 S. Ct. 1731 (1968). However, when a public employee speaks as a citizen on a matter of public concern, that speech is entitled to First Amendment protection. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 50 L. Ed. 2d 471, 97 S. Ct. 568 (1977).

In this case, from October 2003 through February 2004, Mrs. Woodlock complained (1) that BOCES students receiving instruction at the Cornwall Satellite were not receiving state mandated gym or art instruction in violation of state regulations and contrary to requirements set forth in their Individual Education Plans; (2) that Student M.C.'s placement at the Cornwall Satellite was inappropriate; and (3) that the BOCES Cornwall Satellite lacked responsive administrative oversight which compromised the delivery of special education services. For the most part, this is not speech merely related to the conditions of her employment, or speech that can be characterized as a dispute between employer and employee. Certainly, it is of public concern that BOCES is operated properly, providing education services in accordance with state mandates, that the students therein are placed appropriately, and that the administration acts competently. Thus, the Court concludes that Mrs. Woodlock's speech, addressed to what appears to have been deliberate and long continued non-compliance with state law, was constitutionally protected. *See Bernheim v. Litt*, 79 F.3d 318, 325 (2d. Cir. 1996) ("Bernheim's

[Plaintiff-Teacher's] statements regarding the quality of education provided by the public school as measured by achievement test scores and their year-to-year improvement or deterioration on a schoolwide basis may reasonably be considered a matter of public concern. These are issues of serious interest to the community and Bernheim should be able to speak freely about them without fear of retaliation.")

*Did Mrs. Woodlock Suffer an Adverse Employment Action?:*

Mrs. Woodlock contends that she was constructively terminated. Clearly this is "adverse" within the meaning of the statute. *See Quoka v. City of West Haven*, 64 Fed. Appx. 830, 2003 WL 21223422, at *2 (2d Cir. 2003) (stating that constructive termination constitutes an adverse employment action in a First Amendment retaliation claim); *see also Phillips v. Bowen*, 278 F.3d 103, 109 (2d Cir. 2002) (noting that "classic examples" of adverse employment actions are "discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand"). A jury may conclude that a tenure track teacher who is told in so many words that she will not receive tenure and should resign, while she is still in good standing and can use prior favorable evaluations to get another job, has been constructively terminated, and the victim of an adverse employment action.

*Was There A Causal Connection Between the Protected Activity and the Adverse Action Taken Against Mrs. Woodlock?:*

This question is one of motivation, and therefore must be decided by the fact-finder, and not the Court. A jury may well find that Plaintiff was the victim of retaliation. She has alleged

12

the temporal proximity of her complaints regarding matters of public concern with her being reprimanded, disciplined, and constructively terminated when Defendants had the opportunity to do so. Because genuine issues of material fact remain as to motivation, including whether the same action would have been taken against Mrs. Woodlock absent her speech, the issue may not be resolved by a pre-trial motion.

*Is Mrs. Woodlock's § 1983 Claim Against BOCES Barred By the Eleventh Amendment?:*

Defendants contend that BOCES, as an "arm of the state," is protected from suit here under the Eleventh Amendment. If our Court of Appeals affirms in *Woods v. Cafiero*, Dkt. No. 05-1080, argued on January 5, 2006 and awaiting decision, Plaintiff's claims as against BOCES itself would be permitted to go forward. There is a Monell problem, see *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978), however in that Plaintiff has not sufficiently alleged that there is an established policy, custom, or practice so manifest as to imply the constructive acquiescence of senior policy making individuals, or that BOCES failed to train its employees so as not to display a deliberate indifference to the Constitutional rights of its employees. Plaintiff does allege that BOCES had a custom of assigning interns (such as Mrs. Tambini-Wall) to operate satellite programs for an entire school year without adequate supervision, but this allegation does not rise to the level of policy-based indifference to Plaintiff's Constitutional rights.

*Are Any Individual Defendants Entitled to Qualified Immunity?:*

With respect to Defendants Dr. Robert Hanna, "Plaintiff concedes that Defendant

13

Dr. Robert Hanna is not a proper party to these proceedings as he has not taken any affirmative action that would [impose] liability upon him." Plaintiff's Memo in Opposition, p. 29. Accordingly, Plaintiff's claim against Defendant Hanna is dismissed. With respect to the remaining individual defendants, McHale and Mrs. Tambini-Wall, they claim qualified immunity from Plaintiff's actions against him. Public officials are shielded from civil liability "if their actions were objectively reasonable, as evaluated in the context of legal rules that were 'clearly established' at the time." *Poe v. Leonard*, 282 F.3d 123, 123 (2d Cir. 2002) (citation omitted). As Our Court of Appeals has stated:

> [I]f Plaintiff['s] version of the facts reveals that the officials could reasonably have believed they were not violating plaintiff's constitutional rights, the district court should have granted the motion for summary judgment and we will reverse the court's denial of that motion. *See Bizzaro v. Miranda*, 394 F.3d 82, 86(2d. Cir. 2005).

As applied to Defendant McHale, qualified immunity is unwarranted. Plaintiff claims that Defendant McHale received and ignored her complaints relating to matters of public concern, was irritated or annoyed by them, was irritated or annoyed by Mrs. Woodlock's contacting other administrators to voice her concerns, and that she was constructively terminated when McHale could retaliate against her. If these allegations are true, as I must assume at this stage and for these purposes, it is reasonable to conclude that Defendant McHale knew he was violating Plaintiff's rights. Qualified immunity is at the very least fact intensive and may not be resolved by a pre-trial motion.

*Is Mrs. Tambini-Wall a State Actor?*

With respect to Mrs. Tambini-Wall, movants assert that she was merely a student-intern, and therefore is not a "state actor" as defined by § 1983. Mrs. Tambini-Wall is a state actor because she had the apparent authority as administrator at the satellite campus, which McHale rarely visited, and therefore she was in charge day-to-day. Also, Mrs. Tambini-Wall was designated to be the first person to receive any of Plaintiff's concerns/complaints, and pass along the information to McHale. It is alleged that in some instances, Mrs. Tambini-Wall ignored the complaints, or that she did not pass them on.

Although she is in the Court's view a state actor, Mrs. Tambini-Wall did not have the authority to take the adverse employment action complained of. Accordingly, Mrs. Tambini-Wall is entitled to summary judgment in her favor dismissing the Complaint.

## **Conclusion**

The motion is granted and the action is dismissed as to defendants Dr. Robert Hanna and Nancy Tambini-Wall. The claims against the Orange Ulster BOCES are severed. Should our Court of Appeals reverse in *Woods, supra,* an order of dismissal may be submitted as to that defendant. The Court declines at this time to make the finding contemplated by Rule 54(b) Fed.R.Civ.P.

Counsel shall confer to schedule and resolve any uncompleted pre-trial discovery. A conference with the Court is hereby scheduled for September 22, 2006 at 9:30 a.m. to ascertain the status of the matter and schedule a trial date.

SO ORDERED.

Dated: White Plains, New York
      June 20, 2006

                                                  *Charles Brieant*
                                                  Charles L. Brieant, U.S.D.J.